## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **WILLIAM H. KRAUS,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | **Case No. 3:09-0419** |
| | ) | **Judge Trauger** |
| **v.** | ) | |
| | ) | |
| **CITY OF OAK HILL,** | ) | |
| **THOMAS C. ALSUP, in his individual** | ) | |
| **capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the court is a Motion to Dismiss for Failure to State a Claim, or Alternatively, a Motion for Summary Judgment filed by defendant the City of Oak Hill, Tennessee (Docket No. 38) and a Motion to Dismiss or for Summary Judgment filed by defendant Thomas Alsup (Docket No. 39). For the reasons discussed herein, both summary judgment motions will be granted, and this case will be dismissed. Additionally, two previously dismissed defendants, Robert Notestine and Austin McMullen, have filed motions for attorneys' fees (Docket Nos. 33 and 34, respectively). Both of these motions will be denied. However, the court, absent a showing by the plaintiff, is inclined to award Notestine $3,840 as a discovery sanction under Federal Rule of Civil Procedure 37.

## FACTUAL AND PROCEDURAL BACKGROUND

Since its incorporation in 1952, the City of Oak Hill ("Oak Hill") has been a municipal

1

corporation organized under Tennessee law.[1]  Oak Hill is located in Davidson County,

Tennessee, south of the central business district of Nashville, Tennessee.  (Docket No. 38 Ex. 3 at

2.)  The charter for Oak Hill (along with other similar municipalities) is codified by statute and

dictates that Oak Hill operate under a City Manager/Commission form of government.  That is,

the three-member Board of Commissioners is elected by the residents of Oak Hill.  The Board

approves policies and resolutions, which the city manager (who is hired by the Board) ensures are

implemented.  The Board selects a mayor from its membership.

The city manager is a full-time, permanent position, while sitting on the Board does not

require anything near a full-time commitment.  Oak Hill is a small municipality, with about 4,700

residents, only four full-time employees (including the city manager), and no police, fire, or

public works department (those services are provided by the Metro Government of Nashville and

Davidson County, Tennessee).  (*Id.* at 2-3.)

The plaintiff was the city manager of Oak Hill from August 2003 until June of 2008,

when the primary events that are the subject of this litigation occurred.   The plaintiff is 71 years

old and holds a bachelor's degree in political science, two master's degrees in public

administration and urban studies, and a doctorate in public administration.  The plaintiff held

several similar public administration positions in California before moving to Tennessee in 2003.

 (*Id.*)

---

[1]Unless otherwise noted, the facts are drawn from the parties' statements of material facts
(Docket Nos. 45 and 46) and related affidavits and exhibits.  Although facts are drawn from
submissions made by both parties, on a motion for summary judgment, all inferences are drawn
in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith
Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th
Cir. 2000).

2

For the entire relevant time period, defendant Alsup was on the Board and served as mayor. Also serving on the Board in early June 2008 were Tommy Jacobs and Raymond Throckmorton, III. The city attorney was Robert Notestine. In 2006, the friendly relationship between Throckmorton and Alsup was permanently severed over a dispute related to Throckmorton's unsuccessful state senate campaign that year.

In addition to the constantly simmering tension between Alsup and Throckmorton, the end of the plaintiff's tenure as city manager provided significant controversy. Notably, in late 2007, it was publicly revealed that the plaintiff had a prior mail fraud conviction. Additionally, the plaintiff faced considerable and continuing criticism over his position on a land use dispute. It is undisputed that, throughout this difficult period, Alsup supported the plaintiff and "stood by him." (Docket No. 45 at 4.)

In June 2008, Jacobs's four-year term on the Board was set to expire. Neither Alsup nor Throckmorton was up for re-election. Jacobs ran for re-election against, among others, Austin McMullen. The election was set for June 10th. The plaintiff wanted Jacobs to win re-election because he felt that McMullen was running a negative campaign, he was familiar with Jacobs and enjoyed working with him, and because Jacobs was "very objective" in his decision making, in contrast to Alsup and Throckmorton, whose animosity toward each other, in the plaintiff's view, infected the decision making process. (Docket No. 46 at 7.)

While the plaintiff was somewhat conflicted in terms of how openly to support Jacobs (in light of his role as city manager), in the Spring of 2008, the plaintiff contributed $200 to Jacobs's campaign. Additionally, shortly before the election, the plaintiff became aware that the location of the usual polling place for Oak Hill elections had changed. Concerned that potential voters

might go to the wrong location and perceiving an opportunity to show some support for Jacobs, the plaintiff, at his own expense, mailed about 100 postcards to friendly contacts in Oak Hill. Pre-printed on each postcard was: "Re-Elect Tommy Jacobs, Oak Hill Commissioner." (Docket No. 46 at 9.) On each postcard, the plaintiff also hand-wrote something to the effect of: "Hi [recipient], your vote counts! Be sure to vote on June 10th at Our Savior Lutheran Church [the new polling location], 5110 Franklin Pike. Many, many thanks. Bill Kraus." (*Id.* at 10.)

The election was held on June 10, 2008, and McMullen won. Around the time of the election, Alsup began receiving complaints and comments from Oak Hill residents about the plaintiff's postcards, including some concerns that it was inappropriate for the city manager to openly endorse a candidate for the Board. Alsup also learned that the plaintiff had contributed to Jacobs's campaign. In response to these complaints and concerned that "another uproar regarding the plaintiff's actions" could develop at the next public Board meeting on June 19, 2008, Alsup contacted Notestine to investigate whether the plaintiff had acted inappropriately. (Docket No. 45 at 5.) It is undisputed that Alsup hoped that Notestine would uncover legal authority that would validate the plaintiff's actions and "shield" the plaintiff from public criticism at the June 19 meeting. (*Id.*)

Instead, Notestine reviewed the city charter (contained in the Tennessee Code) and discovered T.C.A. § 6-21-106, which states that:

> (a) Neither the city manager, recorder, city judge, chief of police nor any person in the employ of the city, under any of such officers, shall take any active part in or contribute any money toward the nomination or election of any candidate for election to the board of commissioners, except to answer such questions as may be put to them and as they may desire to answer.
>
> (b) A violation of this section shall subject the offenders to removal from office or employment, and to punishment by fine of not more than fifty dollars ($50.00) for

4

each offense.

While Notestine believed that the statute prohibited the plaintiff's conduct, he and Alsup decided that they should seek a second legal opinion, and, on June 13, 2008, they retained Mark Peters, from the Nashville law firm Waller Lansden Dorch & Davis LLP. Again, Alsup hoped that Peters's review of the law would be favorable to the plaintiff. On June 16, 2008, Peters provided Notestine with a three-page legal memorandum that, relying solely on T.C.A. § 6-21-106, concluded that the plaintiff must be removed from office immediately for sending the postcards and for contributing to the campaign. (Docket No. 38 Ex. 5.)

In light of these developments, Alsup decided, entirely on his own, that he, Notestine, and the plaintiff should meet at Alsup's home on the evening on June 16, 2008. No other members of the Board or city government were at the meeting or apprised of it. The plaintiff claims that, after an otherwise friendly discussion, Alsup gave the plaintiff a copy of Peters's memorandum and told the plaintiff he had three choices: retire, resign, or be terminated. The meeting ended shortly thereafter, and the plaintiff drove home.

There is no dispute that Alsup also suggested that the plaintiff seek other legal advice before deciding how to proceed. And, there is no question that the plaintiff was not formally terminated on June 16; all parties understood that any formal action on the plaintiff's employment could not be taken until the full Board met for its regularly scheduled meeting on Thursday, June 19, 2008. (*See* Docket No. 38 Ex. 13 at 68-69; Docket No. 38 Ex. 12 at 56-61; Docket No. 38 Ex. 16 at 93, 108.) At his deposition, the plaintiff testified that, in order to terminate him, "it had to be done at a legally constituted meeting at the board of commissioners." (Docket No. 38 Ex. 16 at 93.)

5

When the plaintiff returned home from the meeting with Alsup and Notestine, he

contacted Throckmorton, who is also an attorney.  Throckmorton quickly reviewed the statute

and told the plaintiff that the "subject to" language in T.C.A. § 6-21-106 indicated that the Board

would have discretion as to how to handle the plaintiff's transgressions and, therefore, removal

from his position as city manager would not be required. (Docket No. 38 Ex. 16 at 99.)

After finishing his discussions with Throckmorton, the plaintiff e-mailed Alsup.  (Docket

No. 39 Ex. 9.)  In that e-mail, the plaintiff expressed his "appreciation" for the way Alsup

"handled tonight's meeting" and informed Alsup that Throckmorton did not agree that T.C.A. §

6-21-106 mandated termination.  (*Id.*)  Over the next two days, the plaintiff consulted with a few

other attorneys regarding the "subject to" language, all of whom agreed that such language

provides discretion.

On Tuesday, June 17, 2008, Notestine became aware of T.C.A. § 7-51-1501.  In relevant

part, this provision states that:

> Notwithstanding the provisions of any county, municipal, metropolitan, or other
> local governmental charter to the contrary, and notwithstanding the provisions of
> any resolution or ordinance adopted by any such county, municipality or other
> local governmental unit to the contrary, every employee of every such local
> governmental unit shall enjoy the same rights of other citizens of Tennessee to be
> a candidate for any state or local political office, the right to participate in
> political activities by supporting or opposing political parties, political candidates,
> and petitions to governmental entities . . . .

Notestine informed Alsup of this provision, and Alsup asked Peters to review this

provision and determine whether it changed his view of how the Board should proceed.   For

reasons unexplained in his declaration, Peters informed Alsup that T.C.A. § 7-51-1501 did not

affect his legal opinion.  (Docket No. 43 at 2.)

On June 17, 2008, the plaintiff arrived for work at City Hall and informed his assistant,

6

M.C. Sparks, that, the night before, "he had been given the option of voluntary retirement or [] if it wasn't voluntary he would be dismissed." (Docket No. 38 Ex. 14 at 12.) That day, the plaintiff drafted a handwritten, three-page retirement letter. This letter did not mention the issues surrounding his support for Jacobs and indicated that he was retiring to spend more time with his family. (Docket No. 39 Ex. 10.) The plaintiff claims that he left this letter with Sparks on June 17th to be typed and presented to him for review. The letter stated that the plaintiff would be retiring effective August 1, 2008.[2] (*Id.*)

Somehow, the plaintiff's handwritten letter was received by Joan Armour, a public relations consultant for Oak Hill. Armour's responsibilities included posting relevant developments on Oak Hill's website. On June 18, 2008, Armour e-mailed the plaintiff a revised, typed version of his retirement letter, asking him to review it and to let her know if it was okay to publish on Oak Hill's website to notify residents of his retirement. The letter was, in large part, the same as the letter submitted by the plaintiff to Sparks, but the revised letter did provide for retirement, effective immediately. (Docket No. 39 Ex. 11.)

On the evening of the 18th, the plaintiff wrote Armour: "Hi Joan . . . looks fine . . . go with it. Can you print me a hard copy . . . I would like to read it into the record [at the June 19 meeting] . . . we are taking a different, but, hopefully, much more successful strategy to pursue .

---

[2]At one point during his deposition, the plaintiff testified that he and Alsup had a phone conversation sometime shortly before the June 19th Board meeting, in which Alsup told the plaintiff that his retirement would have to be immediate, not effective August 1st. (Docket No. 38 Ex. 15 at 253.) This testimony was greeted with significant skepticism by defense counsel as, despite considerable discovery, this was the first mention of such a conversation. (*Id.*) Either way, as discussed below, the plaintiff, as city manager, was aware that Alsup did not personally control the timing of the plaintiff's departure from Oak Hill, or whether that departure would even take place.

. . thanks for all your help, support and involvement.  best of wishes . . .  Bill."[3]  (Docket No. 39 Ex. 12.)  At his deposition, the plaintiff conceded that he had "every opportunity" to review the retirement letter and that he sent the e-mail authorizing Armour to post the retirement letter on the website.  (Docket No. 38 Ex. 16 at 131.)

The scheduled meeting of the Board was held on June 19, 2008, and McMullen was sworn in during the meeting.  (Docket No. 38 Ex. 11 at 3.)  The issue of the plaintiff's departure from the position of city manager was not on the agenda, as the agenda would have been approved prior to plaintiff's retirement announcement.   (Docket No. 38 Ex. 15 at 174.)   The issue of the plaintiff's retirement was raised at the very end of the meeting, when, led by Throckmorton, all three members of the Board acknowledged the plaintiff's retirement, thanked him for his service, and voted unanimously to appoint Sparks as the interim city manager.  At no point during the meeting or the tribute to the plaintiff did the plaintiff say or do anything inconsistent with his previous stated intent to retire.

The plaintiff testified that, after the meeting, he and Alsup had a further conversation about his future with Oak Hill.  Specifically, Alsup offered the plaintiff a private consulting position that would pay about 75 percent of his city manager salary.  (*Id.* at 187-88.)  The plaintiff turned this offer down immediately, as "the city was small and you could not literally divide the work function up."  (*Id.*)

The next day, the plaintiff came to work at Oak Hill City Hall and presented to Alsup a letter purporting to rescind his earlier statement of intent to retire.  The letter, again, made no reference to the events involving Jacobs, but rather stated that the plaintiff had received a lot of

------

[3]The plaintiff included the ellipses in the e-mail.

public support since announcing his retirement and, therefore, he felt that he needed to continue in his role as city manager. (Docket No. 39 Ex. 13.)

Alsup refused the plaintiff's efforts to get his job back. In his affidavit, Alsup states that, "having already accepted [the plaintiff's] retirement and unanimously appointed an interim successor, I saw no point in undoing the retirement and I do not believe it would have been good for the city of Oak Hill." (Docket No. 42 at 6.) The plaintiff maintains that, when he presented Alsup with the letter, Alsup "became very angry, and stormed out of the room, slamming the door behind him" and that, a couple of hours later, Alsup, through an intermediary, ordered the plaintiff off of City Hall property within two hours. (Docket No. 52 at 3-4.) Peters states that Alsup called him on June 20th regarding the plaintiff's request to rescind, and Peters informed Alsup that Oak Hill had no obligation to give the plaintiff his job back. (Docket No. 43 at 2.)

The plaintiff was removed from the Oak Hill payroll on June 30, 2008, and, while he apparently made a presentation to the Board at its July meeting, his request to the Board that "the withdrawal of his notice of intent to retire as city manager be placed on the agenda of the Board . . . was denied." (Docket No. 52 at 3-4; Docket No. 38 Ex. 19 at 6.)

A significant part of the plaintiff's contentious four-day deposition was focused on addressing the plaintiff's inconsistent conduct the week of June 16, 2008. That is, it is far from plain why the plaintiff, armed with support from Throckmorton and a few other legal opinions that termination (or forced retirement) was not required, would still offer up a retirement letter, approve the publication of that letter on the city's website, and then sit through an entire Board meeting without once challenging what he considered to be an illegal forced retirement.

During his deposition, the plaintiff indicated that he believed that Alsup and Notestine

9

were irrationally construing T.C.A. § 6-21-106 to force him out of the city manager position. (Docket No. 38 Ex. 16 at 89-90.) In light of this, the plaintiff, with no actual intent to retire, decided to draft the retirement letter, in an effort to "see what [the Board would do] on June 19th and to determine whether they were going to follow Mr. Alsup's unilateral action." (Docket No. 38 Ex. 17 at 395.) The plaintiff recognizes that, in hindsight, this course of action and his correspondence with Armour was ill-advised if he never had the intent to retire. (*Id.* at 398.)

The plaintiff repeatedly testified that he did not object to the discussion of his retirement during the Board meeting on the 19th because the issue of his retirement had not been "appropriately agendized" and because he had "increasing doubts about the legitimacy of the entire process." (Docket No. 38 Ex. 15 at 162, 171, 261.) That is, the plaintiff did not feel that the end of the meeting, or the "11th hour," was the appropriate time to raise his concerns about his forced retirement. (*Id.*) The plaintiff firmly believed that such issues should be placed on the agenda before being discussed by the Board, and his intention was to place the matter of his continued employment with Oak Hill on the agenda for the July meeting, when it could be considered in light of a complete and accurate factual and legal record. (*Id.*)

The plaintiff believes that his correspondence on June 20th "prevailed over any previous correspondence" and should have been fully effective to withdraw his retirement. (Docket No. 38 Ex. 17 at 396.) This is, the letter should have been accepted, and, then, the Board should have considered, at its July meeting, "whether [the plaintiff] was or was not still employed with the City of Oak Hill." (Docket No. 38 Ex. 18 at 605.)

The plaintiff filed his Complaint against Alsup, McMullen, Notestine, and Oak Hill on May 11, 2009, asserting (1) that his severance from the position of city manager amounted to a

10

"patronage dismissal" not permitted under the First Amendment; (2) that the defendants had retaliated against him for exercising his First Amendment rights; (3) breach of contract, (4) libel, and (5) attorney malpractice by Notestine. (Docket No. 1.) On May 26, 2010, the plaintiff moved to dismiss, with prejudice, all claims except his First Amendment claims against Alsup and Oak Hill. (Docket No. 29.) Receiving no objections, the court granted this motion on June 17, 2010 and dismissed the corresponding parties and claims with prejudice. (Docket No. 30.)

Since then, Notestine and McMullen have filed motions for attorneys' fees, and the remaining defendants (Alsup and Oak Hill) have filed dispositive motions.

## ANALYSIS

The plaintiff claims that "he was forced out of his position as City Manager solely because of his financial contribution to a political candidate and his sending out postcards bearing the name and campaign logo of that candidate to various Oak Hill residents, encouraging them to vote in the municipal election," and that this "constructive discharge" violated his First Amendment rights of free expression, protected by 42 U.S.C. § 1983. (Docket No. 52 at 5.) The remaining defendants, Alsup and Oak Hill, have moved for summary judgment on the plaintiff's remaining First Amendment claims, and the plaintiff has responded, contending issues of fact preclude summary judgment.[4] Additionally, previously dismissed defendants Notestine and McMullen have moved for attorneys' fees under 42 U.S.C. § 1988.

## I.     Standard of Review

---

[4]Oak Hill and Alsup also move to dismiss the plaintiff's Complaint under Fed. R. Civ. P.12(b)(6). (Docket No. 38 Ex. 3 at 7; Docket No. 40 at 1.) A Rule 12(b)(6) motion challenging the sufficiency of a Complaint is to be made "before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b)(6). That is, challenges to the sufficiency of the Complaint should be made prior to the filing of an Answer, not during the summary judgment stage.

11

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.    The First Amendment Claims

### A.    Oak Hill's Motion

The circumstances under which a municipality, such as Oak Hill, may incur Section 1983 liability are well settled. Municipal liability under Section 1983 cannot be based on a *respondeat superior* theory of liability, but, rather, to set forth a "cognizable Section 1983 claim

12

against a municipality, a plaintiff must allege that (1) agents of the municipality, while acting under color of state law, (2) violated the plaintiff's constitutional rights, and (3) that a municipal policy or policy of inaction was the moving force behind the violation." *Memphis, Tennessee Area Local v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004).

On the policy issue, "a municipality can be held liable under Section 1983 for a single decision by the municipality's policymakers," so long as the official making the decision "is the one who has the final authority to establish municipal policy with respect to the action ordered." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993). Generally, a "final policymaker" is an official whose decisions are (1) "final and unreviewable" and (2) not constrained "by the official policies of superior officials." *Miller v. Calhoun County*, 408 F.3d 803, 814 (6th Cir. 2005). A district court usually refers to state law for guidance on whether an individual is a final policymaker. *Id.*

Oak Hill argues that, under this standard, Tennessee law, and the unique facts of this case, a theory of municipal liability is not viable. First, it is the Board, not the mayor, that has the authority to hire and terminate the city manager. T.C.A. § 6-21-101. Moreover, under Tennessee law, "the Board shall exercise its powers in session duly assembled, and no member or group of members thereof shall exercise or attempt to exercise the powers conferred upon the Board except through proceedings adopted at some regular or special session." T.C.A. § 6-20-206.

Oak Hill argues that, to the extent that the plaintiff received the message that he was "fired," that message was only conveyed by Alsup and Notestine, who acted without authority to convey that message to the plaintiff. (Docket No. 38 Ex. 3 at 14-15.) Again, there is no dispute

13

that two-thirds of the Board was unaware of Alsup's actions in calling the June 16th meeting at his home, and the Board certainly did not authorize Alsup to act on its behalf in conveying Alsup's interpretation of T.C.A. § 6-21-106. (*Id.*) That is, to the extent the plaintiff's forced resignation violated his constitutional rights, that violation was not brought about by an "authorized decisionmaker."

Oak Hill relies on *Layman Lessons, Inc. v. City of Millersville, Tenn.*, 636 F. Supp. 2d 620 (M.D. Tenn.2008) in support. *Layman* was also a Section 1983/First Amendment case, in which the plaintiff non-profit corporation claimed that it had been unconstitutionally denied an occupancy permit by the City of Millersville. *Id.* at 625. Judge Wiseman of this court granted summary judgment for the city, because there was no evidence that the individuals who denied the plaintiff the permit "had authority unilaterally to deny any applicant's request" for a permit. *Id.* at 641. Indeed, under Tennessee law, the city board had "final authority regarding zoning issues," and there was no basis for finding the city liable for the unilateral actions of its employees. *Id.*.

Further, Oak Hill points out that its official personnel policy, adopted in 1998, explicitly provides that employees have the same right to participate in political activities as any other citizens, so long as they do not campaign on municipal time or use municipal resources to do so. (Docket No. 38 Ex. 10.) Therefore, Oak Hill argues, the representations by Alsup and Notestine frustrated the official policy of Oak Hill, rather than advancing it. (Docket No. 38 Ex. 3 at 15-17 citing *e.g. Auriemma v. Rice*, 957 F.2d 397, 400 (7th Cir. 1993)("Liability for unauthorized acts is personal. To hold the municipality liable . . . the agent's action must implement rather than frustrate the government's policy.")

14

In response, the plaintiff claims that Oak Hill municipal policy is found in T.C.A. § 6-21-106, which is part of the city charter. (Docket No. 52 at 7.)   That is, Alsup, while acting unilaterally, was "acting in pursuance of what he perceived, based on the advice of the City Attorney and that of outside counsel, to be the requirements of section 6-21-106." (*Id.*)  Stated another way, "in that the actions of the individual defendant Mr. Alsup were undertaken in pursuance of a state statute, which also serves as a provision of the Oak Hill municipal charter, his actions are attributable to the municipality for purposes of Section 1983." (*Id.* at 8.)

Oak Hill clearly has the better of the argument here.  Again, for any termination of the plaintiff to be actionable against Oak Hill itself, the plaintiff must show that the decision was made by one with "final authority to establish municipal policy with respect to the action ordered."  Any indication that the plaintiff was no longer welcome in his role as city manager (whether it occurred at Alsup's home on June 16 or at City Hall on the morning of June 20) came from Alsup himself, who, again, acted unilaterally and did not have authority to terminate the plaintiff as city manager – something which the plaintiff, as city manager, of course, should have known and did know.  Oak Hill's own personnel policy encouraged political activity by its employees, and the plaintiff has put forth no credible evidence that his separation from his position over the week of June 16-20, even to the extent it violated his rights, was "moved" by an Oak Hill municipal policy, as opposed to by a debatable interpretation of a generally applicable state statute.  Therefore, the claims against Oak Hill will be dismissed, and it is not necessary to address Oak Hill's additional arguments for dismissal.

## B.      Defendant Alsup's Motion

As indicated above, there are two prongs to the plaintiff's First Amendment claim against

15

Alsup. One, the plaintiff argues that he was subjected to an unconstitutional "patronage dismissal" and, two, that he was terminated in retaliation for exercising his First Amendment rights. (Docket No. 1 at 15-16.) Alsup has raised the defense of qualified immunity. An overview of the basic law raised by the parties' briefing is appropriate prior to considering the specific arguments.

### i. Patronage dismissal – basic law

A "patronage dismissal" is the termination of a government employee due to his party affiliation or because the employee, "in some fashion, support[s] a political party other than the one supported by his employers." *Heggen v. Lee*, 284 F.3d 675, 680-82 (6th Cir. 2002). The "first step in analyzing a claim of patronage dismissal requires asking whether the party asserting that he was wrongfully terminated has produced sufficient evidence for a jury to find that he was discharged because of his political beliefs or affiliations." *Lane v. City of LaFollette, Tenn.*, 490 F.3d 410, 419 (6th Cir. 2007).

A termination based upon party affiliation is, generally speaking, a violation of the government employee's First Amendment rights, unless the government entity can show that proper party affiliation is "an appropriate requirement for the effective performance of the public office involved." *Heggen*, 284 F.3d at 680-82. This inquiry is a question of law and considers the "inherent duties" of the position and the degree of policymaking authority, confidentiality, and discretion held by the government employee. *Lane*, 490 F.3d at 419.

### ii. First Amendment retaliation - basic law

To establish a First Amendment retaliation claim, the plaintiff has the burden of proof on a three-step inquiry. *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 1998). First, the court must

16

decide whether the relevant "speech addressed a matter of public concern." *Id.* Issues of political interest to the community are matters of public concern. *Id.* Second, the court must balance the employee's interest, as a citizen, in commenting on matters of public concern against the employer's interest in "promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Third, the court must determine whether the protected speech was a "substantial or motivating factor" in the employer's decision to terminate the employee.. *Rodgers*, 344 F.3d at 603. If the plaintiff meets his burden with respect to the three elements, then the burden shifts to the defendant to show that it would have carried out the termination, notwithstanding the speech. *Id.*

### iii. Qualified immunity – basic law

Under the doctrine of qualified immunity, government officials performing discretionary functions "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Generally, the qualified immunity inquiry involves first, determining whether a constitutional or statutory violation occurred, and, if so, then determining if the right infringed was clearly established. *McKinley v. City of Mansfield*, 404 F.3d 418, 429-30 (6th Cir. 2005). However, courts should use their discretion and may consider the issue of whether the right was clearly established first, if such an analysis is appropriate "in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).

To determine whether a right has been clearly established, courts look to "the federal constitutional, statutory, and case law existing at the time of the challenged action." *Rodgers v.*

17

*Jabe*, 43 F.3d 1082, 1085 (6th Cir. 1995). In order for a right to be "clearly established," the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992) (internal quotation omitted). In qualified immunity analysis, government officials performing discretionary functions are entitled to "the benefit of the doubt." *Dickerson v. McClellan*, 101 F.3d 1151, 1160 (6th Cir. 1996). Therefore, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 337, 341 (1999).

### iv. The parties' arguments

Alsup argues that the plaintiff's Section 1983 claim fails for several reasons, but that, even assuming that the plaintiff's retaliation claim survived *Pickering* balancing and accepting the point that the plaintiff was constructively discharged, he is entitled to qualified immunity, because the right at issue was not clearly established.[5] (Docket No. 40 at 14-22.)

That is, given the uncertainty created by the existence of both T.C.A. § 6-21-106 and T.C.A. § 7-51-1501, the absence of any case law discussing the two statutes, and the fact that the various attorneys involved could not agree on the proper course of action, the plaintiff's right, as city manager, to maintain his job under these circumstances was not "clearly established." (*Id.* at 25-26.) That is, "the plaintiff cannot establish . . . that any reasonable official . . . would have known that he violated the plaintiff's First Amendment rights by allegedly expressing the

---

[5]The constructive discharge doctrine recognizes that some facially benign resignations and retirements are, essentially, terminations because the employer has created sufficiently intolerable conditions that the employee feels that he has no choice but to resign. *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 555 (6th Cir. 2009)

18

opinion that the Plaintiff should resign, retire, or face termination." (*Id.* at 26.)

In response, the plaintiff mostly focuses on the "patronage dismissal" aspect of his claim. The plaintiff argues that Tennessee law explicitly provides that the "city manager shall be appointed without regard to the city manager's political beliefs," which indicates, along with the 1998 personnel policy, that the Oak Hill city manager position is not one that is politically sensitive such that it should be subject to permissible patronage dismissals. (Docket No. 52 at 16-18.) On the qualified immunity issue, the plaintiff argues that "the Plaintiff's right to be free from termination based on his political affiliation was clearly established in a particularized sense such that no reasonable official . . . could have believed such conduct was lawful." (*Id.* at 19.) That is, patronage dismissals have long been clearly prohibited, and "the factors indicating the nonpolitical nature of the Plaintiff's job were all in existence at the time of the forced separation." (*Id.*)

v.       **Analysis**

First, the plaintiff has failed to meet the "first step" in the patronage dismissal analysis, as there is certainly no more than a "scintilla" of evidence in the record to support the plaintiff's position that his discharge was a "patronage dismissal." As discussed above, Alsup fully supported the plaintiff through two previous scandals and only began investigating the plaintiff's open support for Jacobs once residents of Oak Hill started complaining. During that investigation, when consulting with Notestine and then Peters, Alsup hoped to uncover legal support for the plaintiff's conduct.

It was only once both Notestine and Peters offered their professional opinions that T.C.A § 6-21-106 required dismissal that, during the June 16th meeting, Alsup told the plaintiff that, in

19

his opinion, the plaintiff would, one way or another, have to leave his job as city manager. However, the next day, when Notestine informed Alsup of T.C.A. § 7-51-1501, Alsup went back to Peters, again requesting that Peters investigate whether there was any way the plaintiff could keep his job. After the plaintiff submitted his retirement letter and his retirement was recognized at the June 19th Board meeting, Alsup offered the plaintiff another job before, the next day, refusing the plaintiff's late attempt to withdraw his retirement letter.

Absent from this recitation of undisputed facts is any indication that the plaintiff's party affiliation or his specific support for a specific candidate had anything to do with Alsup's pressure on the plaintiff to leave his job. The investigation of the plaintiff was driven by the fact that the plaintiff supported a candidate – not a particular candidate – in the June 10th election. That is, there is no evidence that the investigation and pressure faced by the plaintiff were driven by the plaintiff's specific support of Jacobs. Rather, on the undisputed facts, they were driven by the plaintiff's general political activity, given his role as city manager. Because there is insufficient evidence that the plaintiff was terminated because of his political affiliation or because he "in some fashion, support[ed] a political party other than the one supported by his employers," the patronage dismissal claim must fail.

Second, on the First Amendment retaliation claim, the right at issue – the city manager's right to support a political candidate in a municipal election – was not clearly established. The Sixth Circuit has held that "[a]ll public officials have been charged with knowing that public employees may not be disciplined for engaging in speech on matters of public concern. . ." *Chappel v. Montgomery County Fire Protection Dist. No. 1*, 131 F.3d 564, 579-80 (6th Cir. 1997). However, the court also recognized that, if "officers of reasonable competence could

20

disagree" on the constitutionally of a specific action, "immunity should be recognized." *Id.*

Here, while Alsup was charged with the responsibility of knowing that he, generally, could not terminate an employee for speaking out on matters of public concern, the presence of T.C.A. § 6-21-106 rendered the "contours of the right" sufficiently unclear that a reasonable official would not understand "that what he is doing violates the right." Rather, as discussed thoroughly above, state law indicated that the city manager should be removed from his position for publicly supporting a candidate for county commission, and this interpretation of state law was supported by two separate legal opinions.

Again, qualified immunity provides "ample protection" to competent officers who act reasonably in light of law. Here, given that (1) Alsup was responding to an issue raised by his constituents; (2) there was a facially valid state statute that indicated that, in this specific instance, the plaintiff's conduct was not permissible; (3) Alsup retained counsel and investigated the affect of the statute; and (4) all legal counsel informed him that the statute required dismissal of the city manager, the court must conclude that the plaintiff's right, as city manager, to campaign for a certain commissioner was not clearly established and, therefore, Alsup is entitled to qualified immunity.[6] The claims against Alsup will be dismissed.

------------

[6] The plaintiff also argues that the defendants "have conspicuously failed to address at all their abject refusal to consider retaining or reinstating the plaintiff when he sought to rescind his retirement." (Docket No. 52 at 12.) The plaintiff maintains that his claims survive, at least, as "a refusal to hire based on political affiliation or activity" claim. (*Id.*) In their replies, both defendants object that a "failure to re-hire" claim was not previously raised by the plaintiff, who had repeatedly stressed the paramount relevance of the events that occurred early in the week of June 16th. (Docket No. 57 at 8; Docket No. 58 at 4.) First, the defendants have, to some extent, addressed their refusal to re-hire the plaintiff. In Alsup's declaration, he provided an explanation for his response to the plaintiff's withdrawal of the resignation letter, that is, he was not inclined to assist the plaintiff because the plaintiff had already retired and a new city manager had been appointed. (Docket No. 42 at 6.) Also, as discussed above, according to Peters, Alsup asked

## II.     Attorneys' Fees Motions

Both McMullen and Notestine have moved for an award of attorneys' fees pursuant to 42
U.S.C. § 1988. (Docket Nos. 33 and 34.) While Section 1988(b) does permit the court, in its
discretion, to award a "reasonable attorney's fee" to the prevailing party in "any action ... to
enforce a provision of" Section 1983, the Sixth Circuit has construed this language to support
attorneys' fees for prevailing plaintiffs in civil rights cases and, therefore, "an award of attorney
fees against a losing plaintiff in a civil rights action," while not unheard of, "is an extreme
sanction, and must be limited to truly egregious cases of misconduct." *Riddle v. Egensperger*,
266 F.3d 542, 547 (6th Cir. 2001) (internal quotation omitted). A court should generally only
award such fees if the plaintiff's claim was "frivolous, unreasonable, or groundless," viewed
primarily from the plaintiff's perspective at the time that he filed the litigation. *Id.* at 548.

McMullen argues that the plaintiff's allegations against him – that McMullen participated
in the plaintiff's "*de facto* termination . . . because of [the plaintiff's] political support of a
defeated candidate" and that McMullen retaliated against the plaintiff for exercising his First
Amendment rights – were "clearly unreasonable and without foundation," as shown by the
plaintiff's voluntary dismissal with prejudice of all claims against McMullen. (Docket No. 34 at

---

him about the defendants' obligations to re-hire the plaintiff, and Peters informed Alsup that the
defendants had no obligation to do so. Otherwise, the record is poorly developed on the events
that occurred after June 20th, that is, when the Board subsequently denied the plaintiff's request
to put his "withdrawal of retirement" matter on the July 2008 agenda. The record is, however,
simply devoid of evidence that any refusal on the part of the defendants to reconsider the
plaintiff's retirement was based upon his party affiliation or his specific support of Jacobs. Also,
there is no evidence that any refusal to re-hire was retaliatory; rather, it requires no favorable
inference to the defendants to recognize that, by the time that the plaintiff put any "request to
rescind" before the Board, Oak Hill already had a new city manager, and the Board was
undoubtedly frustrated and exhausted by the plaintiff – for reasons completely unrelated to his
political activities.

1-3.) McMullen argues that any termination of the plaintiff was set in motion prior to McMullen becoming a commissioner, and the plaintiff must, therefore, have known that the claims against McMullen were "clearly frivolous." (*Id.* at 3.) McMullen maintains that his counsel spent 448.5 hours on this case and that he incurred $68,303.60 in legal fees ($152,29 per hour). (*Id.* at 4.) McMullen attaches the affidavit of his lead counsel, Mark Nolan, which provides the number of hours each attorney at Mr. Nolan's firm worked on this case. (Docket No. 34 Ex. 3.)

Notestine's request is slightly more nuanced. In his Complaint, the plaintiff asserted claims against Notestine for legal malpractice, along with Section 1983 and other claims. (Docket No. 1 at 18.) Under Tennessee law, expert testimony is required to pursue a claim of legal malpractice. *Rose v. Welch*, 115 S.W.3d 478, 484 (Tenn. Ct. App. 2003). Notestine claims that the plaintiff did not identify the plaintiff's expert by the March 26, 2010 deadline set by the Case Management Order. (Docket No. 18 at 12.)

In his affidavit, Notestine's counsel, Patrick Flynn, states that, on April 30, 2010, he advised plaintiff's counsel, John Herbison, via e-mail that he was in the process of obtaining an expert for his clients, as *the defendants'* expert witness disclosure deadline was May 7, 2010. (Docket No. 34 Ex. 1 at 6.) However, Flynn wrote, in light of the fact that Notestine would be paying for the expert out-of-pocket (due to the parameters of his liability insurance) and the plaintiff had failed to retain an expert, he wanted to know if Herbison would be willing to drop the legal malpractice claim. (*Id.* at 7.) Receiving no reply, Flynn attempted to reach Herbison by phone, but he received no response to that call. (*Id.*) As a consequence, Flynn claims, "it was necessary to employ" the expert and, pursuant to the Case Management Order, the Rule 26 expert disclosure statement was prepared and filed on May 7, 2010. (*Id.*) As noted above, on

May 26, 2010, the plaintiff moved to dismiss the legal malpractice claim with prejudice. (*Id.*) Notestine claims that, in light of these facts, he is entitled to the $3,840 that he personally expended on the expert's services. (*Id.* at 3.*)*

Notestine also claims that he is generally entitled to recoup $20,610.19 in attorneys' fees and $934.35 in deposition costs. (*Id.* at 4.) While not explicitly stated, the basis for this request appears to be the limited right of civil rights defendants to recover fees under Section 1988.[7]

The plaintiff has not responded to either motion. While, under the Local Rules, failure to respond to a motion generally indicates that the non-movant does not oppose the motion, the court cannot make such an inference here. L.R. 7.01(b); *see also* L.R. 54(b)(1)(3)(setting the requirement for opposing counsel to respond to an attorneys' fees motion within 14 days). Given the standard for awarding attorneys' fees to a defendant in a civil rights action and the amount of fees requested in this case, the court can only assume that the failure to respond is the result of an oversight or a misunderstanding on the part of plaintiff's counsel.

Neither defendant has met the exceptionally high standard for recovery set by Section 1988. Viewed from the outset of the litigation, it is clear that the plaintiff had, at least, a credible basis for suing both Notestine and McMullen. That is, he viewed Notestine as one of the key players who, shortly after the plaintiff's campaigning for Jacobs, used an arguably incorrect and narrow view of the law to strongly push for the plaintiff's removal from office. While

---

[7]Notestine filed the relevant materials, including copies of the e-mails that Flynn sent to Herbison, an affidavit from the expert documenting his costs, an affidavit from Notestine explaining that he personally paid the expert costs, and another affidavit from Flynn that provides his hourly rates ($164.00 per hour) and attaches the billing invoices for Flynn's services. (Docket No. 33 Ex. 1 at 9-35.)

McMullen was not yet on the Board at the time of the June 16th meeting, he was sworn in during the June 19th Board meeting, and, therefore, was on the Board at the time that the plaintiff's supposedly forced retirement was accepted. Again, an award of attorneys' fees to a prevailing defendant is an "extreme" sanction limited to "truly egregious" cases of misconduct. Especially given that the plaintiff recognized the weakness of his claims against these defendants by dismissing them prior to summary judgment briefing, there is nothing to suggest that this is an "extreme" case where the losing plaintiff deserves the additional cost of the defendant's attorneys' fees.[8]

The expert fee issue is a separate matter. Under Federal Rule of Civil Procedure 37(b)(2)(C), where the court has found that a party or that party's agent "fails to obey an order to provide or permit discovery," the court "must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Here, the reasonable expenses incurred by Notestine from the plaintiff's unexplained failure to comply with the Initial Case Management Order and communicate with opposing counsel were the $3,840 that Notestine incurred in paying expert costs. An award to Notestine of that amount from the plaintiff and his counsel, jointly and severally, seems appropriate. The plaintiff will have seven days from the date of the accompanying Order to show cause why such a sanction should not be assessed against the plaintiff and his counsel,

_____

[8] As the defendants are not entitled to attorneys' fees under Section 1988, it is not necessary to consider their "prevailing party" status or the reasonableness of the fees incurred. As to Notestine's request for deposition transcript expenses, that request should be submitted to the Clerk of Court in a bill of costs pursuant to Local Rule 54.01 and 28 U.S.C. § 1920.

jointly and severally.

<u>**CONCLUSION**</u>

For the reasons expressed above, the remaining defendants' summary judgment motions will be granted, and this case will be dismissed. The attorneys' fees motions of former defendants Notestine and McMullen will be denied, although the court, absent a showing by the plaintiff, will award Notestine $3,840 as a discovery sanction to be assessed against the plaintiff and his counsel jointly and severally.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge